**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| RUBIE S. LEE,           ) | |
|                       ) | |
|       Plaintiff,       ) | |
|                       ) | |
|       v.                ) | CAUSE NO: 1:03-CV-190-TS |
|                       ) | |
| ANTHONY WAYNE SERVICES,   ) | |
|                       ) | |
|       Defendant.     ) | |

### OPINION AND ORDER

This matter is before the Court on the Defendant's Motion for Summary Judgment [DE 40]. For the reasons that follow, the Defendant's Motion is denied.

### PROCEDURAL BACKGROUND

The Plaintiff, Rubie S. Lee, filed her Complaint in this Court on June 18, 2003, and filed her Amended Complaint on January 28, 2004. The Plaintiff alleges that Anthony Wayne Services, her former employer, violated her rights by discriminating against her on the basis of her sex, race, and disability, and by retaliating against her for filing a charge of discrimination with the EEOC. The Defendant filed its Answer to the Plaintiff's Amended Complaint on February 2, 2004.

The Defendant moved for summary judgment on December 15, 2004. The Plaintiff filed her Response on February 4, 2005, and the Defendant filed its Reply on March 11, 2005.

The Plaintiff abandoned her claim under the Americans with Disabilities Act in her Response to the Defendant's Motion for Summary Judgment. However, her charges under Title VII—for retaliatory dismissal and for race and sex discrimination—remain.

### SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)). Rule 56 further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325.

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the

2

non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Local Rule 56.1 sets forth the non-moving party's responsibility with greater specificity:

> In determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to the motion, as supported by the depositions, discovery responses, affidavits and other admissible evidence on file.

N.D. Ind. L.R. 56.1(b). Thus, to the extent a non-moving party fails to object to the moving party's statement of material facts, this Court will construe the non-moving party's silence as admissions and take the uncontested facts from the movant's brief as admitted to exist without controversy. *See Bradley v. Work*, 154 F.3d 704, 707–08 (7th Cir. 1998) (citing *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921–22 (7th Cir.1994) (collecting cases where we have "repeatedly upheld the strict enforcement" of Local Rule 56.1 and its ilk); *Kunik v. Racine County*, 106 F.3d 168, 174 (7th Cir.1997); *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir.1995)).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443.

**FACTS**

3

Resolving all genuine disputes and drawing all reasonable inferences in the Plaintiff's favor, the facts assumed to be true for purposes of ruling on the Defendant's Motion for Summary Judgment are as follows.

The Defendant, Anthony Wayne Services (AWS), hired the Plaintiff, Rubie S. Lee, an African-American woman, on January 22, 1999. AWS hired her to work as a driver in its Post Masters department. As a driver, Lee traveled to local businesses and retrieved their outgoing mail, which AWS personnel then sorted. After the mail was sorted, AWS drivers such as Lee transported the sorted mail to the post office for deposit in the mail. As a driver, Lee received good performance evaluations, earned a pay raise, and had no problems with her then-supervisor, Michelle Stauffer.

On August 8, 2001, Lee was injured in a work-related car accident: she was struck from behind by another car while stopped at a light. She suffered some injuries as a result of the collision and admitted that she was nervous about driving after the accident. AWS' records indicate that Lee told one of her supervisors, Chris Durnell, and four coworkers that she no longer wanted to be a driver because of the accident.

On August 27, 2001, Lee's manager, Kelli Craighead, placed a letter in Lee's personnel file which reads,

> To Whom It May Concern: On 8-13-01 Rubie Lee stated to me that she [is] no longer interested in a driving position at Postmasters because of two previous accidents. I asked her twice to confirm her decision and she stated that she was sure.

Accordingly, Lee was transferred to a job as an OCR Sweeper,[1] where her primary responsibility was sorting customer mail. In her new position, Chris Durnell was Lee's immediate supervisor. Lee remained an OCR Sweeper for the rest of her employment with AWS, although she occasionally

---

[1] Neither Party defines what "OCR" stands for.

filled in as a backup driver.

**A.      December 28, 2001: Violating Cell Phone Agreement**

On Friday, December 28, 2001, Lee took home "Fort Wayne #3," one of the cell phones AWS keeps for its drivers. Althenia Billingsley, Lee's sister in law and a driver/coordinator at AWS at the time, was with Lee that evening. Billingsley knew the company's cell phone policy and did not think that Lee should have a company cell phone with her after hours. At about nine in the evening, the two were playing cards while Lee was making personal phone calls on the company cell phone.

Earlier, at about 8:30 p.m., Lee accidentally paged AWS's Vice President of Operations, Gary D. Johnloz. He thought it odd that he was being paged at that time, since all the drivers should have already finished their routes. When he returned the page, he heard what sounded like a male voice on the other end, apologizing for having hit the wrong button. Johnloz was suspicious because AWS had only one male driver, and his was not the voice Johnloz heard on the other end.

Johnloz then paged Craighead and asked if she had authorized any of the drivers to take a cell phone home. Craighead said she had not. Craighead said that Angie Turner uses that particular phone during the day, but was almost certain that Angie would not have taken the phone. When he got off the phone with Craighead, Johnloz called Nextel to cancel the service on Fort Wayne #3.

When Johnloz arrived at work at 8:15 a.m. the following Monday, he saw that Fort Wayne #3 was back in its charger. AWS investigated the incident and eventually discovered that it was Lee who had taken the phone. She had made twenty-one phone calls before Johnloz canceled the phone on Friday evening.

When AWS questioned Lee about the incident, she admitted taking the phone and said she needed to take it home because she was going to cover Emily's[2] early route on Monday morning. However, this explanation did not ring true, as Emily was assigned the Fort Wayne #1 cell phone. Other employees had used the cell pones for personal calls and had put personal messages on the answering machine function. Two of those employees were Angela Bice, a white woman, and Barbara Ellis, a black woman.

On January 16, 2002, Craighead issued Lee her first written warning for "Violation of company rules." Craighead cited Lee for violating the company's Cell Phone Agreement by taking a company cell phone home for personal use without permission. Lee had signed a copy of the Cell Phone Agreement on July 9, 2001, while she was still a driver. The Agreement reads,

> I, Rubie Lee, understand that AWS is providing me with a cell phone that is to be used for company related matters only. It shall not be used for personal calls, except in the event of an emergency. . . .
>
> By signing below, I acknowledge that I have read and understood this agreement and will abide by its terms.
>
> s/ Rubie Lee

Lee claims in her briefs that Craighead had given her permission to take the phone home because her mother was having surgery. However, Lee did not mention either this conversation or her mother's surgery in her comments on the second page of her written warning. There, she only argues that she needed the phone for work the following Monday.

Lee refused to sign her name at the end of the Employer Disciplinary Report. Lee later reimbursed her employer with $15 for the personal calls she had made.

---

[2] The Parties do not supply Emily's last name.

**B.      May 9, 2002: Refused Request to Work Upstairs**

On May 9, 2002, Cari Mader, a white AWS employee, asked Lee to help her on a project. Lee agreed, but wanted to do the work upstairs. After Cari said no, Lee complained that she thought she was being discriminated against, since some white employees were doing the same work upstairs. Cari denied Lee's request again and the two continued to argue.

That same day, Craighead issued Lee her second Employment Disciplinary Report, a written warning for "Improper conduct" and "Insubordination." That warning reads:

> Shortly after arriving for work, Rubie was told to go to the hand crew area to do work for Cari because the OCR was not running. She folded materials for 15 to 20 minutes, then told Cari she was going to take her break. She did not return to the hand crew area after break but went back to her normal work and was talking with Angie. About a half hour later, Cari was in the area and Rubie asked to bring the work upstairs. Cari told her she could not—Kelli had instructed Cari [to] keep the work contained. Cari told Rubie that she would have to talk with Kelli. At that point, Rubie told Cari to "take her ass back down there and sit."

Lee denies that she did anything to warrant the disciplinary warning. Her comments on the written report state,

> Cari is lying. She didn't want me down stair anyway. I ask her could I take the work upstair she said no, that the job had to be kept together. But Barb was doing the same job up stair. So why couldn't I bring the job upstair. Cari told me that Kelli [Craighead] said so that why.

Lee again refused to sign the report.

**C.      July 23, 2002: Meeting with Publicover, Failure to get a Raise**

In July 2002, Lee asked to meet with the Human Resources Director, Cathy Publicover, to discuss several matters, including Lee's annual review and Lee's failure to receive a raise. During their meeting on July 23, Lee accused Publicover of acting unprofessionally. Publicover claims that

7

Lee called her a bitch, but Lee denies that this happened or that she ever raised her voice or got upset.

Publicover told Craighead about this exchange; Lee claims that Publicover told Craighead a false version of their conversation. Shortly thereafter, on August 1, 2002, Craighead wrote up an Employee Disciplinary Report placing Lee on ninety days probation for "Improper conduct" and "Insubordination." The report reads:

> Rubie asked to talk with Cathy Publicover, Human Resources, about some questions she had. She asked why she was not allowed to drive anymore. Cathy reminded her that she had requested not to drive. Ruby said that had happened after accident, but that she had driven after that and Cathy told her she would talk with her supervisor.
>
> Rubie also said that she had not had her review and didn't get a raise and knew that others had gotten raises. Cathy told her that she needed to talk with her supervisor, and that she knew that there were others that had not had their evaluations yet.
>
> Rubie was not satisfied with being told to talk with her supervisor and as she left Cathy's office and walked down the stairs, she said, "Bitch." Cathy followed her down to her work area to ask her what she said and Ruby said, "I said, 'It's personal.'" They both returned to Cathy's office where Rubie maintained that she said, "It's personal." Cathy told her she did not believe her.
>
> Rubie's conduct in this incident was very similar to her conduct on May 9, 2002, for which she was given a written warning, and will not be tolerated. Rubie is being placed on probation for 90 days. Any further incidents of improper conduct or insubordination will be cause for immediate termination.

Lee made hand-written comments all over the written report, denying practically everything. She denied that she had requested not to be a driver and denied she had called Cathy a bitch:

> All this is a lie. Cathy you twisted my words, because you want me to leave AWS you said so. [illegible] professional in your work. I'm not refusing to sign, but you didn't tell it the way it happen.
>
> Cathy you're lying. I came up stair very calm to talk to you about me not driving anymore. And about my review, why I didn't get a raise. I said it was something personal, because I'm being harassed by you and Gary that why you're making up lies. I wouldn't call no one a bitch because that what they want me to do so I can be

fired.

As on each of her previous Employee Disciplinary Reports, Lee refused to sign her name at the bottom.

Eligibility for the pay raise in question was based on receiving a favorable annual performance review. When Lee finally received a copy of her annual performance review, she determined that it had been tampered with: it appeared that certain grades had been reduced from "3" to "2". She inquired with supervisor Durnell, who had written her review. He said that he had given her a good review and had expected that she would get the raise.[3]

**D.      August 14, 2002: Filing First EEOC Charge**

On August 14, 2002, Lee filed a charge of discrimination with the EEOC, alleging that the Defendant had discriminated against her on the basis of her sex and race. She claimed that, since Kelli Craighead became her supervisor in 2001, she had been harassed repeatedly and on numerous occasions had been written up for things she had not done. Lee stated that all employees had permission to take a cell phone home, and yet she was the only one disciplined for doing so. For example, Angie Bice, a white woman, used a cell phone for personal calls and was not required to pay for her calls. Lee also mentioned the pay raise issue in her complaint. She stated that in July 2002 she received her yearly review and was refused a raise. Lee claims that when asked, Craighead said she did not know why Lee did not receive a raise.

Lee admits in her deposition testimony that at the time she filed this EEOC charge, she had never heard any of her supervisors direct any racially derogatory comments towards her and could

---

[3] AWS made the strategic decision not to contest these facts, but only to argue this case on the issue of pretext. Lee has not produced any documentation in support of this allegation, such as a copy of the allegedly doctored review.

not even recall a conversation with a supervisor in which her race was mentioned.

When Craighead learned that Lee had filed the complaint, she discussed it with other AWS employees. Craighead expressed a desire not to work with a person that had filed a charge of discrimination and expressed an opinion that filing race discrimination charges made it more difficult for black people to find jobs. Turner says Craighead said to her, "By Rubie doing that they're not going to want to hire your kids or my kids anymore." Turner's children are black and Craighead's children are bi-racial. Craighead also ordered other employees to stop talking with Lee. She warned Turner to stay away from Lee because management was upset with her.

Turner testified that Publicover held a meeting with Turner and other employees to address Lee's discrimination charge. Turner told Publicover that Craighead was showing favoritism and being unfair to Lee. Publicover relayed this conversation to Craighead, who reacted angrily. Thereafter, according to Turner, white employees were treated more favorably than black employees. Neither Turner nor Lee elaborate on this allegation in any detail.

### E.     October 3, 2002: Called Back from Break by Durnell

At noon on October 3, 2002, Lee clocked out for her half hour lunch break. During her break, Lee went into one of the AWS offices to place a telephone call to her physician. Her supervisor, Durnell, came into the office and told Lee to hurry up because he needed her to get back to work on the line. Lee told Durnell that she was speaking with her doctor's office and that she did not have to return to work until 12:30.

Lee states that when Durnell had approached her, a white employee named Stephanie was also in the vicinity. Stephanie was also on break, but had not punched out, although she was

supposed to.

Lee spoke with Durnell after she got off the phone. Durnell started hollering at her about needing to be back on the line. Lee told Durnell that she was frustrated that he had called her back to work, even though she was on an authorized break, but Stephanie was taking an unauthorized break. Durnell did not offer an explanation for asking Lee, rather than Stephanie, to come back to work.

On October 11, Gary Johnloz issued Lee another Employee Disciplinary Report and suspended her, based on her October 3 incident with Durnell, for "Improper conduct" and "Insubordination." The report states that Rubie's behavior was "insubordinate and disruptive and continued until Gary Johnloz was called down to the floor to intercede."

In response, Rubie wrote,

I feel I shouldn't been suspended. I was on my break and Chris [Durnell] harassed me about working while on my break. There was another employee who could of did the job while I was on break.

Again, Rubie refused to sign the report.

That afternoon, Lee met with Gary Johnloz, Kelli Craighead, Chris Durnell, and Cathy Publicover. During that meeting, Gary Johnloz read a document to Lee entitled, "Final Written Warning." The document informed Lee that her behavior for the past year was unacceptable and that an additional incident would result in immediate dismissal. It reads, in part, as follows:

Your behavior over the last year has been at an unacceptable level. We have given you several verbal and written warnings for inappropriate behavior towards supervisors and other unacceptable behavior in hopes that you would change and become a productive and happy Post Masters employee. We have seen no improvement and in fact see more and more disrespect to both supervisors and other staff.

After the incidents of last Thursday, we have determined that you will be given one

11

final opportunity to improve your behavior to an acceptable level. . . .

Any of the following items are among the types of behavior that will be cause for your dismissal:

- Talking back to a supervisor. This includes raising your voice, not listening to the supervisor, slamming a door or any other kind of disrespect.
- Disobeying a request from a supervisor.
- Bad mouthing Post Masters/AWS or a fellow employee.
- Causing any type of disturbance while on the work floor.
- Not adhering to any of Post Master's or AWS's policies, rules, or regulations.

Lee told those present that she did not believe the written warning she received was fair. Lee refused to sign the Final Written Warning. AWS suspended Lee for five days without pay.

## F.   November 21, 2002: Arguing with Staszak; Lee Terminated

On November 21, 2002, Lee was recuperating from a knee injury. She was wearing a knee brace and she had a doctor's note stating that she was supposed to sit while working.

Lee was working on a special project that day for Todd Staszak, AWS' Data Services Manager. Lee's left knee was bothering her and she sat rubbing it when Staszak came by and asked, "You got any work to do?" When Lee responded, "No," Staszak told her that she had better find some work to do. Lee then pointed at the stack of papers on her desk and said she did not need any more work. Staszak said, "Well, you just said you didn't have no work." Lee quipped in reply, "Why you asked a stupid question, I give you a stupid answer." At that point, Staszak said, "That's it," and ran downstairs to his office and started writing up the incident.

The Employee Disciplinary Report Staszak prepared cited Lee for "Improper conduct" and "Other." The Report reads:

> I asked Rubie if she had work. She replied "No." I told her to hang on and I would get her some work. She said, "Don't you see this work in front of me?" I replied "You just told me you didn't have work." Rubie started talking back and became belligerent.

Staszak submitted typewritten notes concerning the November 21, 2002, report that were also placed in Lee's personnel file. The notes list some complaints about Lee's work performance and further describes the November 21, 2002, incident. It reads:

> On Thursday, November 21, 2002, I was preparing some boxes for UPS shipment when I noticed that Rubie was sitting at a table not working. As I passed her, I asked if she had work to do. She replied "No." I told her to hang on and I would get her some. I continued getting the boxes together and heard Rubie say "Can't you see there's work right in front of me I'm doing?" I told her I didn't look, I asked her if she had work and she told me "No." She continued to berate my "stupid" question and said that she was rubbing her knee because it hurt. I told her no less than twice to stop talking back and start working. She continued to be belligerent. I informed her that she needed to stop talking or would be written up. She made her choice clear.
>
> After I turned in the disciplinary form to Gary Johnloz, every time she noticed me in the workshop, she would stop working and rub her knee. At one point, she even laughed and waved at me.

AWS terminated Lee on November 21, 2002, on the basis of all the aforementioned incidents. Johnloz and Publicover met with Lee to tell her she was being terminated. Lee does not recall either Johnloz or Publicover mentioning Lee's race or that she had filed a charge of discrimination. The Separation from Staff notice, prepared by Johnloz, states that "Rubie was terminated due to repeated gross insubordination."

Lee complains that all the above actions were the result of AWS' discriminatory motives. Lee also mentions a few other events in passing, for which she doesn't supply dates or many details: Johnloz accused her of damaging a truck, she was removed from the backup driver position in favor of a white male, she was forced to clock out for breaks unlike white employees. Lee admits that she

did not suffer lost wages nor was she disciplined in any of these events. However, she claims they are relevant because they help establish that Craighead and Johnloz had discriminatory motivations behind the disciplinary actions taken by them and behind Lee's ultimate termination.

## DISCUSSION

The Plaintiff contends that the Defendant, her former employer, discriminated against her on the basis of her race and sex, and also claims that it unlawfully retaliated against her for filing a charge of discrimination.

The Defendant concedes, for the purposes of its Motion for Summary Judgment, that the Plaintiff can make out a prima facie case of discrimination on each of these charges. The Defendant instead argues that it is entitled to summary judgment because the Plaintiff cannot rebut the Defendant's position that it honestly believed that she was guilty of a long-standing pattern of insubordination, a legitimate non-discriminatory reason for her termination. *Cf. Essex v. United Parcel Services, Inc*., 111 F.3d 1304, 1309 (7th Cir., 1997) (holding that insubordination is a legitimate, non-discriminatory reason for discharge). The Defendant states, "[a]lthough Lee vigorously disputes that she was ever insubordinate, she does not address the relevant question for purposes of staving off summary judgment: whether AWS honestly believed that Lee was insubordinate." (Reply Brief at 2–3.) The Plaintiff argues in response that she has submitted sufficient evidence from which a jury could infer that the Defendant's avowed reasons for the adverse employment actions were a pretext for unlawful discrimination and retaliation.

Before proceeding to analyze the Defendant's Motion, the Court pauses to note the oddity of the Defendant's arguments. By granting that the Plaintiff has established a prima facie case, the

Defendant not only admits that she is a black woman who suffered at least one adverse employment action: it also admits that the Plaintiff was meeting her employer's legitimate expectations and that similarly-situated employees outside the Plaintiff's protected classes were treated more favorably. *See Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 704 (7th Cir. 2003).

The Defendant puts the Court in the awkward position of both assuming that the Plaintiff was meeting her employer's legitimate job expectations and that she was fired for repeated acts of gross insubordination. Neither Party notes this tension. The Defendant has also ceded the similarly-situated prong of the Plaintiff's prima facie case, even though the Plaintiff has done little to establish this point. For example, with regard to the cell phone incident, the Plaintiff says she was treated differently than two similarly-situated people, both of whom were women and one of whom was black. Also, never does the Plaintiff establish that there were other employees who had a similar disciplinary record but who were treated more favorably. However, the Court will honor the Defendant's strategic decision and decide its Motion on the issue of pretext.

## A.      Unlawful Dismissal Standard

The Plaintiff has brought suit under several legal theories which charge the Defendant with violating her rights under Title VII: retaliatory dismissal, race discrimination, and sex discrimination. The Seventh Circuit addresses these claims under the same general framework and accordingly they may be treated together.

Because the Plaintiff lacks direct evidence of discrimination, she proceeds under the burden-shifting approach set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892 (7th Cir. 2003) (applying *McDonnell Douglas* test to a

retaliatory dismissal claim); *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 833 (7th Cir. 2005) (applying *McDonnell Douglas* test to sex and race discrimination claims).

> Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of intentional discrimination. Once the plaintiff establishes a prima facie case, a legal, rebuttable presumption of discrimination arises, and a burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. If the employer satisfies that burden, the presumption of discrimination extinguishes, and the burden shifts back to the plaintiff to persuade the trier of fact either directly that a discriminatory reason more likely motivated the action or indirectly that the employer's articulated reason for the employment action is unworthy of credence, but a mere pretext for intentional discrimination. At all times, the ultimate burden of persuasion remains with the plaintiff.

*Nawrot v. CPC Intern.*, 277 F.3d 896, 905–06 (7th Cir. 2002) (citations omitted).

Because the Defendant does not challenge the Plaintiff's ability to make out a prima facie case of discrimination and has presented a non-discriminatory reason for terminating her, the issue on summary judgment is whether the Plaintiff has met her burden of showing that this explanation is a pretext for unlawful discrimination or retaliation.

> To show that an employer's proffered reason is pretextual, a plaintiff must do more than demonstrate that the employer made a mistake. . . . Instead, the plaintiff must demonstrate the employer's reason is unworthy of belief. To this, the plaintiff may show: (1) the proffered reasons are factually baseless, (2) the proffered reasons were not the actual motivation for the discharge, or (3) the proffered reasons were insufficient to motivate the discharge.

*Gusewelle v. City of Wood River*, 374 F.3d 569, 575 (7th Cir. 2004).

> Pretext requires more than a showing that the decision was "mistaken, ill considered or foolish, [and] so long as [the employer] honestly believed those reasons, pretext has not been shown." ("On the issue of pretext, our only concern is the honesty of the employer's explanation. . . ."). We have warned repeatedly that we do not sit as a super-personnel department that reexamines an entity's business decision and reviews the propriety of the decision. With that admonishment, however, we have also stated that "we need not abandon good reason and common sense in assessing an employer's actions."

*Nawrot*, 277 F.3d at 906 (citations omitted).


**B.      Failure to Receive a Pay Raise**

In several places the Plaintiff argues that each incident she complains of is a separate adverse employment action, since her termination was the culmination of these events. This argument is contrary to well-established law on what constitutes an adverse employment action.

Title VII prohibits employers from discriminating against employees with respect to the "terms, conditions or privileges of employment," 42 U.S.C. § 2000e-2(a)(1); "that is, [the employee] must show that she suffered a materially adverse employment action." *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 691 (7th Cir.2001).

> [N]ot everything that makes an employee unhappy is an actionable adverse action. For an employment action to be actionable, it must be a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

*Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000) (citation omitted). An adverse employment action is

> more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Traylor v. Brown*, 783, 788 (7th Cir. 2002). Negative performance evaluations or reprimands, even if unfair, do not constitute adverse employment actions unless accompanied by some tangible job consequence. *Grube v. Lau Industries, Inc*., 257 F.3d 723, 729–30 (7th Cir. 2001) (finding that a transfer to another shift and negative comments directed at the plaintiff did not constitute adverse

employment actions).

Under this standard, only two of her complaints register as adverse employment actions: her termination and her failure to get a raise in July 2002. The Court will examine her failure to get a raise separately but will discuss her other accusations only within the context of her claim for unlawful termination. Each incident is relevant to this claim because the Defendant claims that it terminated the Plaintiff for repeated acts of insubordination and the Plaintiff mentions additional incidents to support her argument that this was not the actual cause of her termination.

As to the Plaintiff's pay raise claim, the allegations in her Amended Complaint are similar to those raised in her August 2002 EEOC Complaint. She claims that she was discriminated against on the basis of her race and/or sex when she was denied a pay raise in July 2002. The Plaintiff alleges that male employees and white employees received pay raises in 2002.

The Plaintiff has also added another allegation that was not in her EEOC Complaint: she was denied a raise because her annual review was falsified. The Plaintiff testified that Chris Durnell, who authored her review, told her that he had ranked her sufficiently high as to merit the raise. She also claims that, when she finally received a copy of her annual performance review, she could tell that certain grades had been lowered from "3" to "2".

As noted above, to survive summary judgment, the Plaintiff must demonstrate that the Defendant's explanation is unworthy of belief by showing that (1) the proffered reasons are factually baseless, (2) the proffered reasons were not the actual motivation for the discharge, or (3) the proffered reasons were insufficient to motivate the discharge. *Gusewelle*, 374 F.3d at 575.

The Defendant's arguments assume that it will win at the summary judgment stage so long as the Plaintiff cannot prove that it did not believe that she was being insubordinate. However, the

18

Defendant ignores both the second and third means listed above for surviving summary judgment. In this case, the Plaintiff does not argue that her alleged insubordination was insufficient to motivate her discharge. Instead, she has alleged facts that, if true, create the unsettling impression that the Defendant's proffered reasons was not the actual motivation for the discharge.

"To establish that a discriminatory reason more likely motivated the employer in taking the challenged action, the plaintiff must present evidence sufficiently substantial to show that, in addition to the defendant's proffered reasons, a discriminatory motive was a determining factor." *Klein v. Trustees of Indiana Univ.*, 766 F.2d 275, 282 (7th Cir. 1985). In this case, the Defendant does not address, either in its Motion for Summary Judgment or in its Reply, the Plaintiff's claims that her annual review was doctored after the fact and that Durnell told her that the review he authored would have entitled her to a raise. The Court must therefore accept, for purposes of summary judgment, these allegations as true.

Where the Defendant has conceded that the Plaintiff has made out a prima facie case of discrimination, and where the Defendant has not responded to the Plaintiff's allegations of such mischief, the Court may not grant summary judgment. On the basis of the Parties' Briefs, the Court assumes for the purposes of this Motion that one of the Defendant's employees doctored the Plaintiff's annual review and that but for this mischief she would have received a raise. This set of circumstances casts sufficient doubt on the Defendant's claim that its honest beliefs about her insubordinate attitude were the actual motivation behind its decision to deny her a pay raise in July 2002. Accordingly, the Defendant's Motion for Summary Judgment is denied as to the Plaintiff's pay raise claim.

19

C.      The Plaintiff's Termination

The Plaintiff charges that her termination was unlawful under several theories: it was the result of race discrimination; it was the result of sex discrimination; and it was retaliation for her filing a complaint with the EEOC in August 2002.

As noted above, to survive summary judgment, the Plaintiff must demonstrate that this account is unworthy of belief by showing that (1) the proffered reasons are factually baseless, (2) the proffered reasons were not the actual motivation for the discharge, or (3) the proffered reasons were insufficient to motivate the discharge. *Gusewelle*, 374 F.3d at 575.

The Defendant argues for summary judgment solely on the basis that the Plaintiff cannot successfully prove that it did not think she was guilty of gross insubordination. For her part, the Plaintiff does not argue that, even if the Defendant honestly believed she had been insubordinate on each occasion memorialized in the Employee Disciplinary Reports, this was insufficient to motivate her discharge. The Court will therefore focus on the first and second avenues of surviving summary judgment.

Under the first method, the Plaintiff can survive summary judgment by demonstrating that the Defendant's proffered non-discriminatory motive is factually baseless. Here, the Plaintiff would have to provide evidence that the Defendant did not actually think she had been insubordinate on the occasions recorded on her Employee Disciplinary Reports. The Plaintiff has not presented evidence to this effect.

> But all of [the plaintiff's] arguments are no more than [her] own self-serving interpretations of the incidents or denials that they ever occurred. They do not address whether [the defendant] honestly disbelieved his explanations and denials, even if incorrectly, or whether its determination that the incidents warranted termination were honestly held. And, it is [the defendant's] belief that matters.

20

*Nawrot v. CPC Intern.*, 277 F.3d 896, 907 (7th Cir. 2002).

To survive summary judgment, therefore, the Plaintiff must provide sufficient evidence that the Defendant's proffered reasons were not the actual motivation for the discharge. As the Court noted above, the Defendant did not respond to several of the Plaintiff's allegations surrounding her failure to receive an expected pay raise in July 2002. That failure prevented the Court from granting summary judgment for the Defendant on the Plaintiff's pay raise claim and it prevents the Court from doing the same as to the Plaintiff's claim for unlawful termination on the basis of sex and race discrimination.

The Plaintiff also recounts other events that took place between the time the Plaintiff was denied a pay raise and her termination in November. These events cast additional doubt on the Defendant's non-discriminatory explanation. According to testimony supplied by the Plaintiff, after Craighead learned that the Plaintiff had filed an EEOC complaint, she expressed a desire not to work with a person that had filed a charge of discrimination and expressed an opinion that filing race discrimination charges made it more difficult for black people to find jobs. Craighead ordered other employees to stop talking with Lee and specifically warned Angie Turner to stay away from the Plaintiff because management was upset with her. According to Turner's testimony, the Defendant treated white employees more favorably than black employees after it learned the Plaintiff had filed an EEOC complaint.

As with some of the Plaintiff's other allegations, the Defendant declined to address these charges. Because the Defendant has not addressed these factual allegations, the Court assumes them to be true for the purposes of the Defendant's Motion for Summary Judgment. These facts, if true, lead to the reasonable conclusion that the Defendant's proffered explanation was not the actual or

sole motivation for the discharge. Instead, they create the impression that, the Defendant's proffered explanation aside, the Defendant was motivated by animus against the Plaintiff due to the fact that she was either black or a woman, or because she had filed a complaint with the EEOC.

Because the Defendant has not responded to the Plaintiff's allegations, the Court cannot grant its Motion for Summary Judgment as to the Plaintiff's claims for unlawful termination on the basis of race and sex discrimination or for retaliatory dismissal.


## CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment [DE 40] is DENIED.

SO ORDERED on June 30, 2005.

 S/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT